UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| KELLY J. FLEMING, | : | Case No. 3:19-CV-00077 |
|---|---|---|
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| vs. | : | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I.   Introduction

Plaintiff Kelly J. Fleming sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits and Supplemental Security Income in September 2015. She alleged that her disabilities precluded her from working starting on July 15, 2013. She listed her disabilities as phlebitis, carpal tunnel syndrome, depression, anxiety, three amputated toes on her left foot, back problems, rotator cuff left shoulder, and obesity. (Doc. #3, *PageID* #280).

Based on the decision of Administrative Law Judge (ALJ) Gregory G. Kenyon that Plaintiff was not under a disability, the Social Security Administration determined denied Plaintiff's applications. *Id.* at 38-47. Plaintiff seeks an Order reversing the ALJ's decision and finding her to be under a disability. She alternatively seeks an Order remanding the case to the Administration for further proceedings. The Commissioner asks the Court to

affirm the ALJ's decision.

## II. "Disability" Defined

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as the Social Security Act defines it—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing "substantial gainful activity." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70.

## III. Background

### A. Plaintiff's Background

On January 15, 2013, the date Plaintiff's asserted disability began, she was 48 years old. This placed her in the category of "younger person" for social-security purposes. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).[1] She has a high-school education. She worked in the past as a production assembler, a cashier/checker, and an order picker.

Plaintiff's present challenges to the ALJ's decision do not focus on her physical impairment but instead focus on her mental impairments. The following discussion

---

[1] The remaining citations to the regulations will identify the pertinent Disability Insurance Benefits regulations with full knowledge of the corresponding Supplemental Security Income regulations.

examines the evidence touching upon her mental impairments.

**B.     Plaintiff's Testimony**

During an administrative hearing held by ALJ Kenyon, Plaintiff testified that she is divorced and lives in a house with her two adult daughters. (Doc. #3, *PageID* #s 57-58). Plaintiff's last job before the ALJ's hearing lasted eight months. She was terminated apparently due to her difficulty interacting with customers. *Id*. at 58-59.

Plaintiff testified that she has social anxiety. She finds it "awful" to be around others. *Id*. at 63. She explained, "I constantly feel like somebody's watching me or coming up behind me." *Id.* at 64. She doesn't visit her friends at their homes, and she asks her daughters to get things from the store for her.

She goes to appointments with her mental-health counselor every week. She sees her psychiatrist about once a month. She visits with her mother once a month and does not socialize with friends. *Id.*

Plaintiff has a "bad" panic attack approximately twice a month. *Id.* at 65. When asked to describe her panic attacks, she replied:

> [I]f I'm in a grocery store and I start to feel really anxious…, and I feel like I can't breathe and somebody's coming up behind me or if somebody's following me, I'll not be able to even think of what I need from the grocery store, and I'll leave my cart full of groceries and leave. I'll just leave it and leave the store.

*Id.* This has occurred to her "dozens of times." *Id.* When she experiences a panic attack, she feels sick to her stomach, like she could throw up. The episodes are precipitated by "[l]ots of appointments, a busy schedule, cold weather and knowing I'm going to have to go

3

outside barefooted." *Id.* at 65-66. She fears being trapped barefooted outside during the winter. (She cannot wear shoes due to foot pain from 3 amputated toes, *id*. at 66).

Plaintiff also suffers from depression caused by "a bunch of stuff." *Id.* She explained, "My sister had a baby and I had a baby. Hers died of crib death, and then … my sister's husband shot her to death." *Id.* These events occurred in 1994. Plaintiff experiences crying spells every day when she thinks about her sister. *Id.* at 67.

Plaintiff also has difficulty concentrating on things. She doesn't watch movies because she can't get interested in them. She's not interested in cooking; her daughters do the cooking. She is "not interested in doing much of anything really." *Id.*

Plaintiff mentioned that she enjoys sewing but it had been a long time since she had last done any sewing. *Id.* at 67-68. When asked if she experienced any other symptoms of depression, she explained:

> I've thought lots of times that I wish I could trade my sister places—lots of times…. I wish—you know, I think she was so much better of a person than I am and had much more value that I do. So, you know, she'd be more value to the world than I would. She was a registered nurse, and she took care of people and I'm just me.

*Id*. at 68.

Plaintiff has trouble making big decisions, and she avoids people. Her house has two levels. Her daughters stay upstairs, and she "pretty much" stays downstairs in the living room. *Id.* at 69.

C. **Medical Evidence**

*Shelby County Counseling Center*

On July 22, 2015, Plaintiff presented to a social worker, Kierstyn Cox "seeking mental health counseling because she report[ed] crying all the time." *Id.* at 460. She thought she was ruining her daughters' lives because she was not able to work.

Plaintiff told Ms. Cox that she had a history of on and off depression and anxiety. *Id.* Her husband committed suicide in 1994 after which she experienced some depression. *Id.* at 460-61. Her symptoms of depression worsened when she split up with her second husband in 2004. Ms. Cox noted that Plaintiff "had a period where she 'felt like herself again' when she dated a man named William but when he passed away her anxiety and depression symptoms returned. *Id.* at 460.

Plaintiff reported that her anxiety impacted her last job. She frequently became irritable at work and eventually stopped working. She was a cashier and had to interact with customers and the customers' behaviors created anxiety for her. She said she would become agitated more than ten times a shift. *Id.* at 462-63.

On mental status examination, Ms. Cox found Plaintiff's memory intact, normal thought processes, attention/concentration, speech, and associations. She exhibited average eye contact and her activity was noted to be agitated. Her mood and affect were noted to be anxious and depressed. *Id.* at 469–71. Ms. Cox diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic features, and panic disorder with agoraphobia. *Id.* at 472.

At her therapy appointment in late July 2015, Plaintiff told Ms. Cox that she hadn't been completely honest about her alcohol intake. Plaintiff reported that she was drinking

5

daily in order to cope with her anxiety. She went to an Alcoholics Anonymous meeting four days before this appointment. But she attempted to go to another AA meeting without success because of her anxiety. *Id.* at 476.

In August 2015, Plaintiff saw Cynthia Hites, a certified nurse practitioner, for medication management. Plaintiff reported "having a lot of problems with anxiety and depression." *Id*. at 424. She often felt paranoid and thought people were watching or following her. She was often irritable and agitated. Her sleep was restless, and she was up and down throughout the night. She often felt panicky and she worried excessively. She often could not make herself leave the house even when she had appointments or things she needed to take care of. *Id.*

Ms. Hites observed that Plaintiff was dysphoric, anxious, and depressed. *Id.* at 427. Like Ms. Cox, Ms. Hites diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic features, and panic disorder with agoraphobia. *Id.* at 428. Ms. Hits prescribed nortriptyline (a depression medication, *see* https://medlineplus.gov/druginfo/meds/a682620.html). *Id.* at 427.

When Plaintiff saw Ms. Hites in late August 2015, she reported that she did not feel her medications were helping. She was experiencing overwhelming anxiety, not sleeping well, and she was still depressed. *Id.* at 430. On mental status examination, she exhibited normal appearance, good eye contact, was cooperative, alert and oriented x 3, her mood was dysphoric, affect was anxious and depressed. *Id.* at 431-32. Her diagnoses remained the same. By that time, Plaintiff was taking Lexapro and Klonopin (depression and panic-attack

medications, respectively, *see* https://medlineplus.gov/druginfo/meds/a603005.html and /a682279.html). Ms. Hites increased the prescribed dosage of each medication. *Id.* at 433.

In early September 2015, Plaintiff reported that her medications "may be helping a little bit. She was able to go into a store to get something she needed[,] but she was still very anxious why [sic: probably "while"] she was in there and almost panicked." *Id.* at 436. Ms. Hites reported that she reassured Plaintiff: "even the fact that she could go into the store is an improvement. She is doing well on the meds as far as not having any side effects, so she is happy about this." *Id*. Ms. Hites kept Plaintiff on the same medications.

Later in September 2015, Plaintiff reported that "she is still having a lot of high anxiety and panic episodes." *Id.* at 442. She had been able to go to physical therapy and to a couple of stores. Ms. Hites started Plaintiff on Rexulti (an antidepressant and schizophrenia medication, *see* https://medlineplus.gov/druginfo/meds/a615046.html).

In October 2015, Plaintiff was still having anxiety. She was able to go to a store over the weekend, but "it was too much for her anxiety," and she was vomiting. She discussed medication options with Ms. Hites. Before changing Plaintiff's medication regimen, Ms. Hites wanted to perform genetic testing to determine what medication would be most beneficial for her. *Id.* at 448.

In November 2015, Plaintiff reported that she felt worse with the new medication. She was not motivated to do anything, even housework. She also reported decreased sleeping due to restless legs. Ms. Hites adjusted her medications. *Id.* at 454.

In July 2016, Plaintiff saw Jennifer Williams, a licensed social worker. Plaintiff

reported that she would like to stop drinking. She reported daily use due to her anxiety. *Id.* at 634.

By August 2016, Plaintiff reported she was depressed and sometimes wished that she would die, but then she thinks about her grandchildren. She then described many stressors affecting her life. She continued "to drink hard liquor and smoke daily to cope with stress." *Id.* at 639. She liked to visit her mom to work on quilts during the week; it helped her feel a little better. *Id.* at 639.

Plaintiff saw Stewart Harris, M.D. for medication management in January 2017. Dr. Stewart found on mental status examination that Plaintiff's thought processes and associations, attention and concentration were normal. Plaintiff did appear however dysphoric, with a blunted affect, and depressed mood. *Id.* at 659–61.

When seen in April 2017 by a professional clinical counselor, Plaintiff had not been seen in counseling since November 2016 but things had improved for her "a little." *Id.* at 649.

In May 2017, Plaintiff reported experiencing mental slowing due to Klonopin, as well as motivation difficulties, insomnia, and anxiety. Carole Foster, a certified nurse practitioner, diagnosed Plaintiff with post-traumatic stress disorder, depressive disorder, agoraphobia, and major depressive disorder. *Id.* at 672, 675, 677. Plaintiff denied experiencing panic attacks but was experiencing anxiety unless she was busy. *Id.* at 675. She had a crying episode at least once a day. She ruminated about the deaths of her sister and her grandchild. She reported nightmares three to four times a week. Plaintiff continued

8

to see Ms. Foster for medication management appointments through the remainder of 2017. *Id.* at 679–95.

### *Counseling Center for Wellness*

Plaintiff began treatment at the Counseling Center for Wellness in July 2017 and continued through at least October 2017. *Id.* at 724–48. Her initial assessment documented diagnoses of alcohol withdrawal, major depression recurrent, moderate anxiety distress, and rule out panic disorder. *Id.* at 746. She reported drinking five to six drinks ("mixed, straight up shots") every night. *Id.* at 738. She "was observed to be anxious, wringing her hands, leg shaking which increased to hand shaking …." *Id.*

In early August 2017, she had maintained sobriety for eight days. *Id.* at 733. In late August 2017, Plaintiff's counselor noted that she relevant thought process with negative and phobic thought content. *Id.* at 730. In early October 2017, Plaintiff had been sober for 35 days. She exhibited no anxiety and no shaking of her legs or hands on that day. *Id.* at 727. In mid-October 2017, she reported being sad, and she had started drinking again. Her mood was down. She was depressed. Her thought content was relevant and preoccupied. *Id.* at 724.

### *State Agency Psychologists*

In February 2016, Connie Jenkins, M.D., reviewed Plaintiff's record for the state agency. *Id.* at 109–15. She opined that Plaintiff had moderate restriction in her activities of daily living; moderate difficulties in social functioning; moderate limitations in concentration, persistence and pace; with no episodes of decompensation of extended

9

duration. *Id.* at 109. Dr. Jenkins concluded that due to her anxiety and depression, Plaintiff would have limitations in her ability to follow and complete detailed tasks. She could complete and follow "simpler" 1 and 2 step tasks. *Id.* at 113. She could perform "simpler" tasks that did not involve frequent interaction with others. *Id*. at 114. She did not like to interact with large groups of people, but she would be able to work in jobs that do not require frequent interaction with coworkers and supervisors. *Id*. Finally, Plaintiff had reported that she did not deal well with change. Dr. Jenkins opined that Plaintiff would work best in jobs that are static in nature. *Id*.

In April 2016, Karla Voyten, Ph.D. affirmed Dr. Jenkins's assessment. *Id.* at 140–47.

IV. **The ALJ's Decision**

ALJ Kenyon evaluated Plaintiff's disability status by examining the evidence under the required five-step evaluation. *See* 20 C.F.R. § 404.1520. He found at steps two and three that Plaintiff's severe impairments—degenerative joint disease of the left shoulder, residuals of the amputation of three toes of the left foot, mild coronary artery disease, a depressive disorder, and an anxiety disorder—and non-severe impairments did not automatically qualify her for benefits. (Doc. #3, *PageID* #s 41-42; *see* 20 C.F.R. Part 404, Subpart P, Appendix 1).

The ALJ's assessed Plaintiff's residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), and found that she could perform less than the full range of light work with the

following additional limitations:

> (1) occasional crawling, crouching, kneeling, stooping, balancing, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) occasional use of left upper extremity for pushing, pulling, and overhead reaching; (4) no work around hazards such as unprotected heights or dangerous machinery; (5) limited to performing unskilled, simple, repetitive tasks; (6) occasional contact with co-workers and supervisors; (7) no public contact; (8) no fast paced production work or jobs which involve strict production quotas; and (9) limited to performing jobs which involve very little, if any, change in the job duties or the work routine from one day to the next.

*Id.* at 42-43. With this assessment in mind, the ALJ also found at step four that Plaintiff was unable to perform her past work.

At step five, the ALJ concluded that Plaintiff could perform jobs that exist in significant numbers in the national economy. *Id.* at 45-46. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 47.

**V.    Standard of Review**

An ALJ's non-disability decision is affirmed unless he or she "failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Lindsley v. Commissioner of Social Sec.*, 560 F.3d 601, 604 (6th 2009) (citations omitted); *cf. Blackburn v. Comm'r of Soc. Sec.*, 748 F. App'x 45, 47 (6th Cir. 2018) ("We review the administrative law judge's application of legal standards with fresh eyes and factual findings for substantial evidence."). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.

11

3d 708, 722 (6th Cir. 2014). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F. 3d 234, 241 (6th Cir. 2007). If the ALJ applies the correct legal criteria and substantial evidence supports the ALJ's factual conclusions, the decision is affirmed "even if substantial evidence exists in the record supporting a different conclusion." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (citation omitted).

Yet, "[e]ven if supported by substantial evidence…, a decision of the Commissioner will not be upheld where the [an ALJ] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); (citations omitted); *see, e.g., Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6th Cir. 2013) (remanding because, ALJ's "more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires.); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004) (remanding due to ALJ's failure to provide "good reasons," as the Regulations require, for not crediting treating physician's opinion).

**VI. Discussion**

Plaintiff argues that ALJ Kenyon failed to include all of her mental-health disorders as severe impairments and erred by finding that her major depressive disorder "with psychotic features," posttraumatic stress disorder, and panic disorder were not severe impairments. (Doc. #9, *PageID* #837). Additionally, he did not analyze why the missing

12

mental impairments were not considered severe." *Id.* at 838.

Plaintiff further contends that ALJ Kenyon incorrectly created and relied on a residual functional capacity to identify work available to her at step five of the sequential evaluation process. She explains that ALJ Kenyon erred by failing to consider all of her mental-health impairments. According to Plaintiff, if the ALJ had properly found all her mental-health impairments to be severe, "then a residual functional capacity would have shown [her] to require a limitation of no interpersonal contact with coworkers, supervisors, or the public." *Id*. at 839. And if Plaintiff had included this limitation in her residual functional capacity and hypothetical questions, the vocational expert testified there would be no competitive work activity for such a person.

Plaintiff misstates her diagnosis of major depressive disorder "with" psychotic features; she was instead diagnosed with major depressive disorder "without" psychotic features. *See* Doc. #3, *PageID* #s 428, 433, 439, 445, 451, 458, 472, 474, 656, 662, 669, 676, 683, 689, 696. Regardless, an impairment is considered "severe" at step two of the sequential evaluation "if it significantly limits an individual's physical or mental abilities to do basic work activities …." Soc. Sec. R. 96-3p, 1996 WL 374181, at *2 (July 2, 1996); *see* 20 C.F.R. § 404.1520(a)(4)(ii). The severity requirement permits the Administration "to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988) (citation omitted). "Severity," therefore, presents a "*de minimis* hurdle": "[A]n impairment can be considered not severe only if it is a slight

abnormality that minimally affects work ability regardless of age, education, and experience." *Id*. at 862 (citation omitted).

In the present case, ALJ Kenyon found at step two that Plaintiff had many severe physical impairments and two severe mental impairments—depressive disorder and anxiety disorder. Although the ALJ did not analyze at step two whether Plaintiff's other mental-health impairments were severe, this was not reversible error. The ALJ analyzed whether Plaintiff's depression and anxiety met or equaled §12.04 and §12.06 (respectively) of the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. He also considered at step three the severity of Plaintiff's "impairments, singly and in combination" thus indicating that he assessed all her impairments—both severe and non-severe. *See* Doc. #3, *PageID* #41. This assessment included consideration of the limitations caused by all her mental impairments in the Listing's "category B." *See id*.

The ALJ considered Plaintiff's depression and anxiety at step four of the sequential evaluation. He also considered her symptoms of paranoia, ease of agitation, irritability, restlessness at night, excessive worry due to financial concerns, and difficulty leaving the house (i.e., agoraphobia) "even for scheduled appointments because she feels panicked." *Id*. at 44. The ALJ correctly recognized that Plaintiff had been diagnosed with major depressive disorder without psychotic features and a panic disorder. *Id*. When, as in the present case, "an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Fisk v. Astrue,* 253 F. App'x 580, 583 (6th Cir.

2007) (quoting, in part, *Maziarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987); *see Pompa v. Comm'r of Soc. Sec.,* 73 F. App'x 801, 803 (6th Cir. 2003) ("once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps.") (citation omitted).

Substantial evidence supports the ALJ's inclusion of many mental-work limitations in his assessment of Plaintiff's residual functional capacity. *See supra*, §IV. He was not required to do more even though Plaintiff's treatment records indicated that she struggled at times symptoms of agoraphobia, paranoia, and panic disorder. *See Ealy*, 594 F.3d at 512 ("If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion." (citation omitted)).

The administrative record, moreover, does not contain an opinion by any of Plaintiff's treating medical sources or by an examining medical source detailing the gravity of her mental-health symptoms or describing the impact of her mental impairments have on her functioning. The ALJ therefore turned to, and placed partial weight on, the opinions of the state agency medical consultants, Drs. Jenkins and Voyten. *Id.* at 45. This was not error. "State agency medical and psychological consultants … are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, ALJs must consider findings and other opinions of State agency medical and psychological consultants[.]" 20 C.F.R. § 404.1527(e)(2) (i). As noted above, the state agency consultants found that due Plaintiff's anxiety and

depression, she was limited in her ability to follow and complete detailed tasks. She could complete and follow simpler one and two step tasks. *Id.* at 113. Plaintiff could perform simpler tasks that did not involve frequent interaction with others. She would be able to work in jobs that do not require frequent interaction with coworkers and supervisors. *Id.* at 114. The ALJ properly determined that their use of "infrequent interpersonal contacts: is imprecise and has been incorporated in Plaintiff's residual functional capacity as precluding public contact and limiting her to occasional contact with coworkers and supervisors. *Id.* at 45. The ALJ concluded that these limitations are more closely tailored to Plaintiff's specific social problems. *Id.*

Plaintiff next contends that ALJ Kenyon incorrectly created and relied on a residual functional capacity to identify work available to her at step five of the sequential evaluation process. She explains that ALJ Kenyon erred by failing to consider all of her mental-health impairments. According to Plaintiff, if the ALJ had properly found all her mental-health impairments to be severe, "then a residual functional capacity would have shown [her] to require a limitation of no interpersonal contact with coworkers, supervisors, or the public." (Doc. #9, *PageID* #839). And, if Plaintiff had included this limitation in her residual functional capacity and hypothetical questions, the vocational expert testified there would be no competitive work activity for such a person. Plaintiff relies on her subjective reports, during her counseling sessions at Shelby County Center, of symptoms indicating she struggles with agoraphobia accompanied by panic attacks. (Doc. #3 at 420-508, 633-37, 638-97, 723-48). But the ALJ considered Plaintiff's agoraphobia with panic attacks when

16

assessing her residual functional capacity and reasonably concluded that she was capable of performing unskilled, simple, repetitive tasks; occasional contact with co-workers and supervisors; no public contact; no fast-paced production work or jobs which involve strict production quotas; and to performing jobs which involve very little, if any, change in the job duties or the work routine from one day to the next. *Id.* at 43. The ALJ reasonably noted that Plaintiff had never been psychiatrically hospitalized and the level of psychological care she had received was mild. *Id.* at 45.

The ALJ also based his assessment of Plaintiff's mental residual functional capacity on the opinions of the state agency medical consultants, Dr. Jenkins and Dr. Voyten. *Id.* at 45. The ALJ placed partial weight on their opinions. He provided valid reasons for doing so and substantial evidence supported his reasons. Consequently, it was not error for the ALJ to rely on their opinions. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("[s]tate agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."). As noted above, these psychologists found that due to Plaintiff's anxiety and depression, she would have limitations in her ability to follow and complete detailed tasks. They further believed that she could complete and follow simpler one and two step tasks; could perform simpler tasks that did not involve frequent interaction with others; and could work in jobs that do not require frequent interaction with coworkers and supervisors. (Doc. #3, *PageID* #114). The ALJ reasonably found these psychologists' use of the phrase "infrequent interpersonal contacts" to be imprecise, and he sensibly included in Plaintiff's residual functional capacity

work no public contact and occasional contact with coworkers and supervisors. *Id.* at 45. The ALJ reasonably found these limitations more closely tailored to Plaintiff's specific social problems. *Id.* And, because the ALJ examined these physicians' opinions, weighed them against the evidence of record, and reasonably declined to credit all of their opinions, he made no error by placing partial weight on them. *Cf. Downs v. Comm'r of Social Sec.*, 634 F. App'x 551, 554 (6th Cir. 2016) (no error in relying on record-reviewers' opinion over the opinions of treating physician because when "the ALJ provided sound reasons— supported by substantial evidence …."); *cf. also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004) (no error when ALJ credited only the part of state-agency physician's supported by substantial evidence).

Plaintiff lastly contends that the ALJ's hypothetical questions to the vocational expert did not accurately portray her severe physical and mental limitations and, consequently, the vocational expert's answer do not constitute substantial evidence in support of the ALJ's decision. Plaintiff points out that the vocational expert testified that no competitive employments is available to a hypothetical person who is absent from work two times per month or off task by five percent or more.

"In order for a vocational expert's testimony to constitute substantial evidence that a significant number of jobs exists in the economy, 'the question[s] must accurately portray a claimant's physical and mental impairments.'" *Keeton v. Commissioner of Soc. Sec.*, 583 F. App'x 515, 533 (6th Cir. 2014) (quoting, in part, *Ealy,* 594 F.3d at 516). "'[T]he ALJ is only required to incorporate into the hypothetical questions those limitations that have [properly]

been accepted as credible[.]" *Id.* (quoting *McIlroy v. Comm'r of Soc. Sec.,* 42 F. App'x 738, 739 (6th Cir. 2002)).

The ALJ's hypothetical questions included all the functional limitations that he found to be supported by evidence. Plaintiff has not demonstrated that substantial evidence fails to support the ALJ's assessment of her residual functional capacity or that the ALJ committed legal error in assessing her functional limitations. Because the ALJ's hypothetical questions accurately portrayed Plaintiff's residual functional capacity, the vocational expert's testimony constituted substantial evidence supporting the ALJ's conclusions at step five of the sequential evaluation. *See Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) (vocational excerpt's testimony in response to accurate hypothetical question constitutes substantial evidence); *see also Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 438 (6th Cir. 2010) ("When asked a hypothetical question encompassing the limitations that the ALJ found credible, the [vocational expert] testified that jobs existed. The additional limitations offered by Carrelli's attorney—limitations that the ALJ found not credible—need not be considered.").

Accordingly, for the above reasons, Plaintiff's Statement of Errors lacks merit.

**IT IS THEREFORE ORDERED THAT:**

1. The Commissioner's non-disability determination is **AFFIRMED**; and

2. The case is terminated on the docket of this Court.

March 24, 2020                          *s/Sharon L. Ovington*
                                        Sharon L. Ovington
                                        United States Magistrate Judge